******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., dissenting. In a state with 169 municipalities, each legislatively created and with its own form of governance, it should not be surprising that this court often counsels against judicial interference in local legislative decisions. See, e.g., *Benenson* v. *Board of Representatives*, 223 Conn. 777, 784, 612 A.2d 50 (1992) ("[c]ourts will interfere with legislative decisions made by municipalities only where the party seeking review can characterize the legislative act as illegal, fraudulent, or corrupt" (internal quotation marks omitted)). This case illustrates well the importance of heeding our own advice, which the court today does not. I respectfully dissent.

The Planning Board of the City of Stamford is made up of five mayoral appointees, nominated by the mayor and approved by the Stamford Board of Representatives. Stamford Charter §§ C6-00-2 and C6-00-3. In the present case, the Planning Board approved amendments to Stamford's master plan of development, "the general land use Plan for the physical development of the City." Stamford Charter § C6-30-3. The plaintiffs, The Strand/BRC Group, LLC, 5-9 Woodland, LLC, Woodland Pacific, LLC, and Walter Wheeler Drive SPE, LLC, owners of land in the city, proposed an amendment "to modify their properties' land use categories to allow high-density residential development on the site of a former recycling collection and disposal center." The Planning Board also submitted a proposed amendment pertaining to nearby properties. The Planning Board then conducted public hearings on both amendments and approved them. Pursuant to § C6-30-7 of the Stamford Charter (charter), a Stamford resident filed a protest petition with the Planning Board, signed by adjacent property owners, objecting to the proposed amendments. The Planning Board referred the petition to the defendant, the Board of Representatives of the City of Stamford. See Stamford Charter § C6-30-7.

The Board of Representatives is made up of forty members elected by the city's residents, two from each of the city's twenty voting districts. Stamford Charter §§ C1-80-1 and C1-80-4. The charter provides that "[t]he legislative power of the City [is] vested in the Board of Representatives. No enumeration of powers contained in this Charter shall be deemed to limit the legislative power of the Board except as specifically provided in this Charter." Stamford Charter § C2-10-1. In the present case, upon the Planning Board's referral of the petition, the Board of Representatives voted to reject the amendments. To get their amendment reinstated, pursuant to § C6-30-20, the plaintiffs appealed to the trial court. The plaintiffs claimed, among other things, that the Planning Board never should have referred the petition to the

Board of Representatives without first determining whether the petition was timely filed and contained enough signatures for referral. The plaintiffs contend that there were an insufficient number of signatures because the Board of Representatives improperly combined petition signatures for the two separate applications. The trial court sustained the appeal, nullifying the Board of Representatives' rejection of the plaintiff developers' proposed amendment to the master plan.

In affirming the judgment of the trial court, the majority today strikes down the action of Stamford's most representative and authoritative legislative body: the rejection of an amendment to the master plan proposed by the plaintiff developers. The majority instead affirms amendments approved by five Planning Board members, passed to facilitate the development of a high density residential development. The majority is able to upend the political process in this way only by labeling as substantive that which is procedural and imposing judicial standards on that which is legislative.

It is undisputed that, when approving or rejecting proposed amendments to the city's master plan, both the Planning Board and the Board of Representatives exercise legislative authority. This court has recognized that, "in the planning and zoning context, [a] zoning amendment is a change in the ordinance, enacted by the legislative authority of a municipality." (Emphasis omitted; internal quotation marks omitted.) *Stamford Ridgeway Associates* v. *Board of Representatives*, 214 Conn. 407, 425, 572 A.2d 951 (1990). Similarly, in a case also involving Stamford's charter, we indicated that, "[the] [B]oard [of Representatives], in reviewing the action of the [city's] zoning board, is called upon to perform a legislative function." *Burke* v. *Board of Representatives*, 148 Conn. 33, 39, 166 A.2d 849 (1961). No one contends that the Planning Board's action is other than legislative. "The plain language of [the charter provision] leaves no room for any other construction." *Benenson* v. *Board of Representatives*, supra, 223 Conn. 783. In exercising their respective authority related to amending the master plan for the city, both the Planning Board and the Board of Representatives are directed to apply the same legislative standards. See Stamford Charter §§ C6-30-3 and C6-30-7;[1] see also *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 432 (referring to standards guiding Board of Representatives as "typical legislative standards; viz., promotion of health and the general welfare, provision for adequate light and air, prevention of overcrowding, and avoidance of undue population concentration" (internal quotation marks omitted)).

I fully agree with the majority's well reasoned analysis and conclusion that, consistent with the charter's language, it is the Planning Board's responsibility to determine whether a protest petition meets the provisions

for a referral to the Board of Representatives, namely, whether the petition is signed by the prescribed number of property owners in the subject area and filed with the Planning Board within ten days after the official publication of the Planning Board's decision. See Stamford Charter § C6-30-7. More particularly, I agree with the majority that "the Board of Representatives lacks the authority to assess the validity of a protest petition after it has been duly referred by the Planning Board."

Also, like the majority, I find support for this conclusion in our case law, most of it concerning the charter. In *Benenson*, we interpreted an almost identical provision of the charter to hold that a protest petition brings a matter before the Board of Representatives because the plain language of the charter "does not provide for the approval or rejection of the 'petition' itself." *Benenson* v. *Board of Representatives*, supra, 223 Conn. 783. As the majority correctly acknowledges, the petition is "merely the vehicle" that brings the issue to the Board of Representatives. (Internal quotation marks omitted.) We have reiterated that the "question before the [B]oard [of Representatives is] not the petition, which indicate[s] the property owners' objection to the [master plan amendment], but whether the [master plan amendment] should be approved." *Benenson* v. *Board of Representatives*, supra, 783. Decades before that case, we explained that "[t]he manifest legislative intent expressed in the Stamford charter is that the [B]oard of [R]epresentatives, in considering an amendment to the zoning map, shall review the legislative action of the [city's] zoning board on that board's written findings, recommendations and reasons. The question before the [B]oard of [R]epresentatives is whether to approve or to reject the amendment." *Burke* v. *Board of Representatives*, supra, 148 Conn. 39.

Thus, the majority and I agree that, when a petition is filed with the Planning Board, that board must review it and determine if it warrants referral to the Board of Representatives. Upon referral of the petition by the Planning Board, the Board of Representatives may act only on the merits of the proposed amendment, applying the same legislative standards as the Planning Board. In fact, the Planning Board did refer the petition to the Board of Representatives, albeit with no record of having reviewed and determined whether the petition was timely or contained the number of signatures contemplated by the charter for referral. The Board of Representatives voted on the merits of the amendments and rejected them, which the charter authorized it to do upon referral from the Planning Board.

The majority's reasoning focuses on the Board of Representatives' lack of authority to pass on the petition's validity, not on the Planning Board's failure to pass on the petition's validity and its resulting referral of the petition. The majority repeats several times that

the Board of Representatives had no authority to determine the petition's validity, including whether it contained sufficient signatures. We know this even if the Planning Board did not. Both the charter's language and our case law make this clear. See Stamford Charter § C6-30-7; see also *Benenson* v. *Board of Representatives*, supra, 223 Conn. 783; *Burke* v. *Board of Representatives*, supra, 148 Conn. 35–36. But this does not necessarily address what happens when the Planning Board erroneously refers a petition to the Board of Representatives. Does the Board of Representatives then lack the authority to pass on the proposed amendment? If the Board of Representatives has no authority to review or pass on the petition's validity, is it for a court to go back and scrutinize whether the referral from one legislative body to another was proper and, if not, to void any subsequent legislative action?

The majority's answers to these questions are "yes" and "yes." The majority claims that the Board of Representatives lacks authority to pass on these amendments because the charter's signature provision "confers a limited authority on the Board of Representatives, which may be exercised only if a sufficient percentage of the owners of private property within a defined geographic area . . . sign and timely file a protest petition with the Planning Board." (Emphasis omitted.) I part company with the majority here because, in my view, it is acting like a court reviewing executive action or a ruling of a lower court rather than a court reviewing legislative action, over which its appropriate scrutiny is much more limited. See, e.g., *Benenson* v. *Board of Representatives*, supra, 223 Conn. 784. And, in voiding the Board of Representatives' subsequent action, the majority appoints itself as a municipal signature counter, which, the majority claims, correctly in my view, the charter delegates to the Planning Board.

The majority is careful not to employ terms such as "jurisdiction" or "aggrievement" in its analysis. These concepts have no obvious place in a court's review of such layers of legislative action. But the majority's use of terms such as "substantive," "condition precedent," "void," and "invalid," is a dead giveaway: the majority cannot disengage from its reflexive judicial role, a role in which, before acting, a body must examine its own jurisdiction and the jurisdiction of the body that came before it. In this world, the majority is constrained to find the exercise of legislative authority by the Board of Representatives on the merits of the amendment tainted by the earlier, improper exercise of authority of the Planning Board, as determined by a court *after* the Board of Representatives has acted. An examination of forums in which these jurisdictional concepts are appropriately applied, and scrutiny of the scant authority the majority cites for its conclusion, exposes the majority's jurisdictional reasoning as faulty.

For example, with the exception of actions challenging an unconstitutional statute or a state officer's actions in excess of statutory authority; *Horton* v. *Meskill*, 172 Conn. 615, 624, 376 A.2d 359 (1977); a court reviews action by state executive officials only pursuant to legislative authorization, which—because it implicates the state's sovereign immunity from suit—is strictly construed. See, e.g., *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, 293 Conn. 382, 388, 978 A.2d 49 (2009) (statutes in derogation of sovereign immunity should be strictly construed). In a direct action against an executive official, the plaintiff must identify a statute that explicitly or by necessary implication compels a conclusion that the legislature intended to waive the state's sovereign immunity from suit. Id. Similarly, under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., "aggrieved" persons who have "exhausted all administrative remedies available within the agency" may appeal from a "final decision" within forty-five days to the Superior Court. General Statutes § 4-183 (a) and (c). Given that § 4-183 constitutes a waiver of sovereign immunity; *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 488 n.20, 55 A.3d 251 (2012); these requirements are considered jurisdictional, and, without strict compliance with each, the Superior Court lacks jurisdiction over the case. See, e.g., *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 812, 629 A.2d 367 (1993) (no jurisdiction for lack of contested case and final decision); *Fletcher* v. *Planning & Zoning Commission*, 158 Conn. 497, 502, 508, 264 A.2d 566 (1969) (no jurisdiction for lack of aggrievement); see also *Piteau* v. *Board of Education*, 300 Conn. 667, 690, 15 A.3d 1067 (2011) (no jurisdiction for failure to exhaust administrative remedies). If a trial court rules on the merits of such an action and orders relief against a state agency or official without examining its jurisdiction, and this court or the Appellate Court determines that the trial court lacked jurisdiction, the appellate court will reverse the judgment of the lower court and the relief ordered. See, e.g., *Stepney, LLC* v. *Fairfield*, 263 Conn. 558, 571, 821 A.2d 725 (2003) (remanding case with direction to dismiss for lack of jurisdiction because of failure to exhaust administrative remedies); *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 812 (remanding case with direction to dismiss appeal for lack of jurisdiction when there was no contested case and therefore no final decision); *Fletcher* v. *Planning & Zoning Commission*, supra, 508 (remanding case with direction to dismiss appeal for lack of jurisdiction when plaintiff failed to establish aggrievement).

Similarly, with some common-law exceptions, an appellate court may review trial court rulings only by legislative delegation and authority. "Under General Statutes §§ 52-263 and 51-197a, the 'statutory right to

appeal is limited to appeals by aggrieved parties from final judgments.' " *Halladay* v. *Commissioner of Correction*, 340 Conn. 52, 57, 262 A.3d 823 (2021); see also id. ("[b]ecause our jurisdiction over appeals . . . is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim" (internal quotation marks omitted)); cf. *State* v. *Skipwith*, 326 Conn. 512, 521, 165 A.3d 1211 (2017) (explaining that writ of error is common-law remedy that "exists independent[ly] of [any] statutory authorization" (internal quotation marks omitted)). As was the case in the previously discussed example concerning a trial court's review of state executive action, this court will reverse the judgment of the Appellate Court if we determine that the Appellate Court lacked jurisdiction; see, e.g., *Redding Life Care, LLC* v. *Redding*, 331 Conn. 711, 744, 207 A.3d 493 (2019) (remanding case to Appellate Court to dismiss writ of error for lack of jurisdiction because discovery order was not final judgment); and we will dismiss appeals before our own court if we determine that we do not have jurisdiction. See, e.g., *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 767, 628 A.2d 1303 (1993) (dismissing appeal for lack of jurisdiction because of failure to timely appeal pursuant to General Statutes § 52-278*l*).

These jurisdictional concepts are foreign to the legislative process and to a court's review of that process. "[C]ourts cannot pass upon the regularity of legislative proceedings, at least in the absence of a violation of some constitutional restriction." *State* v. *Sitka*, 11 Conn. App. 342, 346, 527 A.2d 265 (1987), citing *State* v. *Savings Bank of New London*, 79 Conn. 141, 152, 64 A. 5 (1906). We have since the nineteenth century held that "[c]ourts will interfere with legislative decisions made by municipalities only where the party seeking review can characterize the legislative act as illegal, fraudulent, or corrupt. . . . When such bodies are acting within the limits of the powers conferred upon them, and in due form of law, the right of courts to supervise, review or restrain is exceedingly limited." (Internal quotation marks omitted.) *Benenson* v. *Board of Representatives*, supra, 223 Conn. 784; *Whitney* v. *New Haven*, 58 Conn. 450, 457, 20 A. 666 (1890). "Difference in opinion or judgment is never a sufficient ground for interference." *Whitney* v. *New Haven*, supra, 457. This includes a difference in opinion about how the petition signatures should or should not be counted. The majority cites this line of cases—which limits judicial review of legislative action and distinguishes legislative action from administrative or quasi-judicial action of municipal actors—as well as our precedents distinguishing mandatory statutory provisions from directory provisions, but does not engage with or follow their reasoning. These cases make this point clearly.

For example, in *LaTorre* v. *Hartford*, 167 Conn. 1,

3–6, 355 A.2d 101 (1974), two city councilmen were financially associated with an insurance company that sought to widen a road to build an office building. Pursuant to Hartford's city charter, the Court of Common Council was authorized to "lay out, construct, reconstruct, alter . . . streets" and to "open and widen streets . . . ." (Citation omitted; internal quotation marks omitted.) Id., 4. Notwithstanding the trial court's own determination that the councilmen should have been disqualified, this court held that the council's vote to pass the ordinance widening the street was not invalid. See id., 9. The court noted that, when, as in that case, "the municipal authorities act in accordance with formal requirements, courts will interfere only where fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power, or violation of law, enter into or characterize the action taken." (Internal quotation marks omitted.) Id., 9, quoting *Whitney* v. *New Haven*, supra, 58 Conn. 457. We reasoned that, because "the [C]ourt of [C]ommon [C]ouncil was acting in a proper legislative capacity in adopting the ordinance to widen [the road]; that the ordinance was enacted for a public purpose; that none of the councilmen acted out of improper motives or permitted any consideration to intrude into the deliberations and actions other than what in [their] sound judgment was in the best interest of the city; and that there was no bad faith, clear abuse of power or plain disregard of duty by the [C]ourt of [C]ommon [C]ouncil in enacting the [road] widening ordinance," the trial court erred in vacating the council's enactment based on the councilmen's connection to the company. *LaTorre* v. *Hartford*, supra, 9. We so concluded based on "due regard for the legislative magistracy and . . . a reluctance to involve the courts in political controversies, and in the review and revision of many, if not all, major controversial decisions of the legislative or executive authorities of a municipality . . . ." Id., 8.

In contrast, in *Mills* v. *Town Plan & Zoning Commission*, 145 Conn. 237, 140 A.2d 871 (1958), overruled in part on other grounds by *Mott's Realty Corp.* v. *Town Plan & Zoning Commission*, 152 Conn. 535, 209 A.2d 179 (1965), we sustained an appeal challenging a plan and zoning commission's change in both the town's comprehensive plan and a zoning designation. In that case, the commission unanimously denied an application to rezone land from agricultural to a more commercial designation to allow the construction of a shopping center, reasoning that the land was subject to flooding and that there already was adequate land in the area already zoned for business. Id., 239. The applicants reapplied for a change in the comprehensive plan and a zone change several weeks later, and the commission granted the application by a split vote. Id., 239–40. As the court explained, "[a]fter the denial of the first application and prior to the filing of the second, the members

of the commission and the applicants met privately and agreed upon conditions under which a new application would be considered." Id., 241. The court held that this opened to judicial scrutiny the propriety of the commission's decision to approve the change in the comprehensive plan and the zone change, despite the reluctance of courts to interfere with the actions of legislative bodies, because "a court can grant relief where the local authority has acted illegally or arbitrarily and has clearly abused the discretion vested in it." Id., 242. In the present case, the Board of Representatives' vote on the merits of the amendments cannot reasonably be considered "illegal" conduct that will overcome our high threshold for judicial review of legislative actions, just because the Planning Board failed to validate the petition before referring it. Nor is it the same kind of administrative or quasi-judicial action that warrants judicial scrutiny in accordance with these principles. See, e.g., *Low* v. *Madison*, 135 Conn. 1, 9, 60 A.2d 774 (1948) (invalidating zoning commission's approval of zone change for commission member's wife due to conflict of interest because "administration of power of that nature, whether it be denominated legislative or quasi-judicial, demands the highest public confidence," despite courts' reluctance to inquire into motives of enacting body); see also *LaTorre* v. *Hartford*, supra, 167 Conn. 8 ("[t]his court has consistently applied the standards enunciated in *Low* . . . to zoning boards and commissions, and to public officials acting in administrative or quasi-judicial capacities"). In determining whether the Board of Representatives' action is illegal or arbitrary, the pertinent question is whether the signature provision is mandatory or directory. Unless and until the signature provision is deemed mandatory, which, as I will discuss, is not, any exercise of authority by the Board of Representatives without sufficient signatures is not illegal, arbitrary, or without due form of law in the way our case law has articulated.

"In construing a [municipal] charter, the rules of statutory construction generally apply. . . . In arriving at the intention of the framers of the charter the whole and every part of the instrument must be taken and compared together. In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and word in the instrument and related laws." (Internal quotation marks omitted.) *Cook-Littman* v. *Board of Selectmen*, 328 Conn. 758, 768, 184 A.3d 253 (2018). "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory,

especially where the requirement is stated in affirmative terms unaccompanied by negative words." (Internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 19, 848 A.2d 418 (2004); see also *Winslow* v. *Zoning Board*, 143 Conn. 381, 387–88, 122 A.2d 789 (1956) (Board of Representatives was able to amend ordinance despite failure to comply with sixty day requirement in charter).

In particular, we have followed "applicable tenets of statutory construction . . . to ascribe significance to the absence" of legislative consequences in concluding that procedural requirements are directory and not mandatory. *Leo Fedus & Sons Construction Co.* v. *Zoning Board of Appeals*, 225 Conn. 432, 441, 623 A.2d 1007 (1993). "In *Koepke* v. *Zoning Board of Appeals*, 223 Conn. 171, 177, 610 A.2d 1301 (1992), we determined that because the Coventry [Z]oning [B]oard of [A]ppeals had failed to publish adequate notice of a hearing, the hearing and subsequent revocation of the plaintiff's permit were invalid. We then addressed the consequences that flow from a zoning board's invalid hearing and subsequent ruling on an appeal from a decision of a zoning enforcement officer. Id. On that issue we stated: While the board's failure to give proper notice of its public hearing nullified its subsequent actions, that default had no further automatic consequences. *Even if a failure to give proper notice were deemed the equivalent of a failure to take timely action within the time constraints of* [General Statutes] § 8-7, *that statute, contrary to General Statutes §§ 8-3 (g) or 8-26, does not make inaction tantamount to approval either of the challenged zoning permit or of the challenged appeal*. . . . Id., 178–79." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Leo Fedus & Sons Construction Co.* v. *Zoning Board of Appeals*, supra, 442–43.

In so concluding, we relied on *Donohue* v. *Zoning Board of Appeals*, 155 Conn. 550, 235 A.2d 643 (1967), in which we held that a statute providing that "[the zoning] board shall decide such appeal within sixty days after the hearing" was directory, and not mandatory, and, therefore, the board's decision, rendered after more than sixty days, was not void. (Internal quotation marks omitted.) Id., 554. "In determining whether a statute is mandatory or merely directory, the most satisfactory and conclusive test is whether the prescribed mode of action is of the essence of the thing to be accomplished or, in other words, whether it relates to matter of substance or matter of convenience." Id. We concluded that the provision was directory, and, therefore, the board's decision was not void because (1) the provision related to procedure, (2) the language was affirmative in character and intended to encourage timely decisions by the board, (3) the statute contained nothing that "expressly invalidate[d] a belated decision or [that] inferentially [made] compliance therewith a

condition precedent," (4) the provision was "not of the essence of the thing to be accomplished," and (5) there was no time limitation, "the nonobservance of which render[ed] the board's decision voidable." Id., 554–55.

Likewise, in the present case, the better reading of § C6-30-7 of the charter, more consistent with our case law, is that it is directory and procedural, not mandatory, substantive, or containing a "condition precedent" to the Board of Representatives' lawful exercise of legislative power. Section C6-30-7 provides in relevant part that, "[i]f twenty (20) percent or more of the owners of the privately-owned land in the area included in any proposed amendment to the Master Plan, or the owners of twenty (20) percent or more of the privately-owned land located within five hundred (500) feet of the borders of such area, file a signed petition with the Planning Board within ten days after the official publication of the decision thereon, objecting to the proposed amendment, then said decision shall have no force or effect but the *matter* shall be referred by the Planning Board to the Board of Representatives within twenty days after such official publication, together with written findings, recommendations and reasons. The Board of Representatives shall approve or reject such proposed *amendment* . . . . When acting upon such *matters* the Board of Representatives shall be guided by the same standards as are prescribed for the Planning Board in Section C6-30-3 of this Charter. *The failure of the Board of Representatives either to approve or reject said amendment within the above time limit shall be deemed as approval of the Planning Board's decision.*" (Emphasis added.) This provision "is stated in affirmative terms unaccompanied by negative words." (Internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, supra, 269 Conn. 19. With its time period (ten days) and signature provision (20 percent or more), § C6-30-7 provides for convenience and dispatch. The provision relates to procedure; it begins the process by which an amendment can be referred to the Board of Representatives by preventing the decision from going into "force or effect" and directing the Planning Board to refer the matter with "written findings, recommendations and reasons." Stamford Charter § C6-30-7. The language is affirmative and intended to encourage and facilitate timely review by the Board of Representatives of "matters" about which affected residents feel strongly because it signals to the Board of Representatives that there is a matter affecting enough residents to warrant review. The charter then gives the Board of Representatives the power to vote down or to approve the amendment when referred. The signature provision, therefore, is not one of substance but one of convenience to ensure the orderly review of amendments by the Board of Representatives.

The best evidence that this provision is directory is that the charter prescribes no consequence for the Plan-

ning Board's referral of a petition that contains an insufficient number of signatures and does not expressly, or even impliedly, invalidate a decision by the Board of Representatives for the same insufficiency. See Stamford Charter § C6-30-7. " 'A reliable guide in determining whether a statutory provision is . . . mandatory is whether the provision is accompanied by language that expressly invalidates any action taken after noncompliance with the provision.' . . . By contrast, where a statute by its terms imposes some other specific penalty, it is reasonable to assume that the legislature contemplated that there would be instances of noncompliance and did not intend to invalidate such actions. . . . [The] 'lack of a penalty provision or invalidation of an action as a consequence for failure to comply with the statutory directive is a significant indication that the statute is directory.' " (Citations omitted.) *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, 314 Conn. 749, 759–60, 104 A.3d 713 (2014). If the drafters had intended to bar the Board of Representatives from reviewing an amendment on account of an insufficient number of signatures on the petition, it could have included a consequence in the provision, as it did in § C6-30-7. See *Leo Fedus & Sons Construction Co.* v. *Zoning Board of Appeals*, supra, 225 Conn. 442 (because other statutory provisions expressly provide for automatic approval, "it can be inferred that had the legislature intended that the failure of a zoning board of appeals to hold a hearing within sixty-five days results in automatic approval, the legislature would have so provided"). Indeed, the very same provision contains a mandated outcome for the Board of Representatives' failure either to approve or reject an amendment within a certain time, namely, it "shall be deemed as approval of the Planning Board's decision." Stamford Charter § C6-30-7. Had the drafters used similar, outcome determinative language in § C6-30-7, the majority's assertion that sufficient signatures are a "condition precedent" to the Board of Representatives' exercise of authority, and that any exercise of authority is "void" without those signatures, might hold some weight.[2]

The majority makes my point for me with its discussion of cases in which we have determined that a time limitation is mandatory, as contrasted with its catalog of cases in which we have held such provisions to be directory. In the cases cited in which we have held that a time limitation is mandatory, there has been an accompanying approval clause, attaching a consequence to a legislative body's failure to act on a decision within a certain time period. See, e.g., *Vartuli* v. *Sotire*, 192 Conn. 353, 362, 472 A.2d 336 (1984) (legislature "expressly made approval of a coastal development plan mandatory upon failure to disapprove an application within the specified time period," in part, because of automatic approval clause in accompanying statute), overruled by *Leo Fedus & Sons Construction Co.* v.

*Zoning Board of Appeals*, 225 Conn. 432, 623 A.2d 1007 (1993); *Viking Construction Co.* v. *Planning Commission*, 181 Conn. 243, 246, 435 A.2d 29 (1980) (requirement to act on subdivision application within time limits was mandatory because "[f]ailure [of] the commission to act within this time frame results in the approval of the subdivision application by operation of law"). Section C6-30-7 is an example of such a provision: the Board of Representatives' failure either to approve or reject the amendment after two regularly scheduled meetings shall be deemed an approval of the Planning Board's decision. In contrast, as I indicated previously, and as in the line of cases the majority cites in which a time limitation is directory, the charter imposes no consequence on the Board of Representatives for taking action on a proposed amendment that arrived pursuant to a petition containing an insufficient number of signatures because the Board of Representatives has no authority or responsibility to scrutinize the petition but has authority to rule on the proposed amendment. See *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 466, 692 A.2d 742 (1997) (requirement to provide notice of assessment within thirty days of hearing was held to be directory, in part because "there is no language expressly invalidating a defective notice"); *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 617, 662 A.2d 762 (1995) ("[a] reliable guide in determining whether a statutory provision is directory or mandatory is whether the provision is accompanied by language that expressly invalidates any action taken after noncompliance with the provision"); *State* v. *Tedesco*, 175 Conn. 279, 285, 397 A.2d 1352 (1978) (Compliance with a time limitation in an agency's regulations was held to be directory because it is "always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party." (Internal quotation marks omitted.)); *Broadriver, Inc.* v. *Stamford*, 158 Conn. 522, 530, 265 A.2d 75 (1969) (ninety day requirement to file return of notice was held to be directory because, in part, "[t]he statute contains nothing to invalidate a belated title transfer or which inferentially makes compliance with the time requirement a condition precedent"), cert. denied, 398 U.S. 938, 90 S. Ct. 1841, 26 L. Ed. 2d 270 (1970); see also *Meadowbrook Center, Inc.* v. *Buchman*, 328 Conn. 586, 597, 181 A.3d 550 (2018) ("[T]he language of Practice Book § 11-21 does not specifically invalidate or otherwise penalize motions filed beyond the thirty day deadline. 'This lack of a penalty provision or invalidation of an action as a consequence for failure to comply with the statutory directive is a significant indication that the statute is directory.' "); *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 314

Conn. 761–62 (observing that our appellate courts have concluded that "statutory deadlines are directory where there is no express legislative guidance to the contrary and no indication that the legislature intended the deadline to be jurisdictional" by distinguishing cases in which statute provided consequence for failure to act within certain time and cases in which statute did not).

Nonetheless, the majority insists that "a *valid* protest petition is a *condition precedent* to the authority of the [B]oard of [R]epresentatives to vote on the merits of an amendment," and only by voiding the Board of Representatives' action on the amendment is the charter given its "intended and obvious meaning . . . ." (Emphasis added.) In an exercise of circular self-definition, the majority opines that the Board of Representatives "acted on a proposed amendment that was not properly before it due to the legal defect in the protest petition" and that the signature threshold is a "condition precedent to the Board of Representatives' authority to vote on the merits of an amendment" that is the " 'essence' " of the provision. The majority contends that the provision was "crafted to achieve a manifestly substantive purpose," which, it asserts without citation, is to limit the Board of Representatives' authority "to situations in which a protest petition is signed by a significant percentage of the persons most affected by the amendment . . . ." (Emphasis omitted.) In particular, the majority cites no cases and provides no legal analysis as to how a court determines that a provision prescribing a legislative process is "substantive" or a "condition precedent . . . ."[3]

The best the majority can muster for support is *Stamford Ridgeway Associates*, which the majority claims stands for the proposition that the signature provision is a "substantive provision of the charter intended to ensure that review by the Board of Representatives is triggered if, and only if, there is a sufficient number of owners of private land with interests directly affected by the proposed amendment." The case says no such thing, and simply calling that proposition "[i]nherent" in the holding of *Stamford Ridgeway Associates* does not strengthen the majority's conclusion. To understand why the majority is mistaken about this precedent requires an understanding of the precise proposal under consideration at the local level in that case.

In *Stamford Ridgeway Associates*, the Zoning Board of the City of Stamford approved a comprehensive zoning plan for the city, consisting of eight separate applications that covered "large sections of the city of Stamford and included areas for which various zone changes were proposed, as well as other areas that were to remain unchanged." *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 214 Conn. 409. The plaintiffs, local property owners adversely affected by some of the zone changes proposed in the eighth application,

filed protest petitions requesting referral to the Board of Representatives to challenge the zone changes. Id., 409–10. Pursuant to the charter, the Zoning Board referred "its findings, recommendations and reasons in connection with its action in approving" the application to the Board of Representatives. Id., 411. The Board of Representatives took no action on the plaintiffs' petitions, which constituted an affirmance of the Zoning Board's decision. Id. The plaintiffs appealed to the Superior Court, which, after a trial, sustained the appeal and reversed the action of the Board of Representatives, holding that, under the charter, the Board of Representatives could act only on the entire application as a whole, and not piecemeal, because the Zoning Board had adopted the changes as a " 'single package.' " Id., 419. The trial court further held that its decision was without prejudice to the Board of Representatives' determination whether there was "a sufficient number of petitioners [seeking] a hearing treating the matter as a whole." (Internal quotation marks omitted.) Id., 420.

This court rejected the trial court's conclusion that the Board of Representatives could not act on separate amendments. See id., 422. Looking to the charter, we determined that the language, "[20] percent or more of the owners of the privately-owned land in the area included in any proposed amendment to the [z]oning [m]ap," meant that the 20 percent threshold is measured by the areas to be changed or rezoned, and not the entire application. (Emphasis omitted; internal quotation marks omitted.) Id., 424; see also id., 424–26. To hold otherwise could make it impossible to obtain enough signatures to meet the 20 percent threshold because unaffected property owners, or those happy with the amendment as it pertains to them, might be reluctant to sign the petition, thereby enabling a municipality "to [e]nsure passage of a highly objectionable zoning amendment by simply combining it with another large, unobjectionable amendment. A statute must not be construed in a manner that would permit its purpose to be defeated." (Internal quotation marks omitted.) Id., 426. This court then rejected a broad reading of the phrase "any proposed amendment" to mean all amendments contained in an application because doing so "would limit the right of property owners to petition the [B]oard of [R]epresentatives and *would be in contravention of the legislative intent and purpose of [a former provision of the charter] § C-552.2 [which is essentially the same as § C6-30-7] to provide landowners a right to appeal to the board*. It would require a petitioner to obtain signatures of 20 percent of the property owners included in all of the amendments or zone changes encompassed in one application." (Emphasis added.) Id., 428. "A narrow interpretation of 'any' in the phrase 'in any proposed amendment' of § C-552.2 would not only effectuate the ultimate charter purpose giving the right to landowners to protest pro-

posed zone changes but it is the only reasonable and rational construction of § C-552.2." Id., 430.

Thus, the discussion in *Stamford Ridgeway Associates* makes clear that the signature provision is not an aggrievement, condition precedent, or limitation provision.[4] Rather, it protects affected nearby landowners[5] by empowering them to obtain greater review by the Board of Representatives, not less, and nothing in our discussion in that case suggested that the purpose of the provision was to place a jurisdictional condition ("if, and only if," to use the majority's language) on the Board of Representatives' authority. See id., 426. It cannot, therefore, be said that the signature provision is a matter of substance or that the full legislative scheme evinces an intent to impose a mandatory requirement.[6] The more faithful reading of the holding in *Stamford Ridgeway Associates* is that the purpose of the charter provision is to facilitate referral to the Board of Representatives.

Although I agree that the Board of Representatives cannot "act in contravention of charter provisions expressly limiting that authority to specified conditions," the only express limits that the charter provides for the Board of Representatives is that it act on an amendment within a certain time period and that it be guided by typical zoning standards. The signature provision may be an express limit on the Planning Board, but that does not mean that the subsequent exercise of legislative authority by the Board of Representatives is likewise constrained.[7] The majority's attempt to make it so falters on the same grounds as its endeavor to imbue the signature provision as a "substantive" provision or "condition precedent . . . ."

Further, although the majority relies heavily on *Burke* v. *Board of Representatives*, supra, 148 Conn. 33, that case supports my thesis precisely.[8] In that case, the Board of Representatives "failed to follow the charter requirements for the adoption of either an ordinance or a resolution." Id., 41. Although we explained that, when "the charter . . . provides that action of the legislative body shall be by ordinance or resolution, it must act in the manner prescribed"; in that case, the charter did "not require that the [B]oard of [R]epresentatives shall act only by ordinance or resolution. [The charter] empowers the board to adopt and amend its own rules of order. . . . This the board could do in the area where the charter does not specifically provide otherwise. . . . The claim that the action of the [B]oard of [R]epresentatives was invalid because of its failure to follow the rules prescribed by the charter for the adoption of ordinances or resolutions therefore [fails]." (Citations omitted.) Id., 42–43. We then rejected the claim that the zoning board's work was thwarted if the Board of Representatives could act without notice and a hearing, holding that "[a]ny claimed defect in the zoning law

and procedures adopted for the city of Stamford is a matter for legislative consideration. Courts cannot read into statutes, by the process of interpretation, provisions for notice and a full hearing which are not expressed in them. . . . Courts must apply statutes as they find them, whether or not they think that the statutes might be improved by the inclusion of other or additional provisions." (Citations omitted.) Id., 43. Likewise, the majority may not read into the charter a limitation on the Board of Representatives' exercise of authority that is not present.

Trained as lawyers and operating as we do in a judicial forum, it is understandably difficult for judicial officers to keep our hands off the legislative process and to try not to make regular that which is irregular. As a court, we are drawn to consider a signature provision like the one in the present case to be akin to an "aggrievement" requirement. That is familiar to us. Without explicitly saying so, that is how the majority treats it. But measured against our cases, and particularly as applied to the legislative arena, it is not.

For example, if the protest petition had been filed one day late and the Planning Board still referred it to the Board of Representatives, there is no doubt that, under our previously discussed cases, we would conclude that the timeliness provision is not a condition precedent or a mandatory requirement. The Planning Board's referral would not be void; nor would the Board of Representatives' action upon referral.[9] Similarly, there is no evidence that the drafters of the charter intended the signature provision, found only words away from the ten day provision, to be a strict jurisdictional or aggrievement requirement, let alone a condition precedent, and we should resist the temptation to impose judicial order on a process that is not orderly. Not all legislative errors warrant judicial intervention and management. "Absent a clear showing of fraud, illegality, or corruption, courts will not intervene in the legislative process." *Northeast Electronics Corp.* v. *Royal Associates*, 184 Conn. 589, 593, 440 A.2d 239 (1981). The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function. *Tillman* v. *Planning & Zoning Commission*, 341 Conn. 117, 128, 266 A.3d 792 (2021). Any dissatisfaction with the Board of Representatives' exercise of authority in rejecting the amendment is remedied by engaging in the political process. See, e.g., *Schieffelin & Co.* v. *Dept. of Liquor Control*, 194 Conn. 165, 185, 479 A.2d 1191 (1984); *Northeast Electronics Corp.* v. *Royal Associates*, supra, 593.

The judiciary, unlike the elected representatives of Stamford, is uniquely unequipped to delve into the local legislative arena. In fact, we very recently stated that,

"[i]n traditional zoning appeals, the scope of judicial review depends on whether the zoning commission has acted in its legislative or administrative capacity. . . . Zoning must be sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission." (Internal quotation marks omitted.) *Tillman* v. *Planning & Zoning Commission*, supra, 341 Conn. 127–28. Courts afford "zoning authorities this discretion in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions which create the problem and shape the solution. . . . Courts, therefore, must not disturb the decision of a zoning commission unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally." (Citation omitted; internal quotation marks omitted.) *First Hartford Realty Corp.* v. *Plan & Zoning Commission*, 165 Conn. 533, 540–41, 338 A.2d 490 (1973). Inasmuch as the Board of Representatives, under the charter, undertakes the same legislative function and applies the same standards as a zoning board or a planning board, we should afford the same deference in this matter.

Because of the majority's determination to supervise the regularity of local legislative processes, I am concerned that this court will necessarily inject itself into local legislative disputes in innumerable municipalities. In the present case, for example, what is at stake is whether there should be an amendment to the master plan for the city of Stamford. This is a classic political matter for the city and its duly elected local representatives to consider. Although the framers might have determined, for reasons of convenience or dispatch, to put the onus to protest an amendment on those who own land nearby through the signature provision, as I have established, this provision cannot be understood as a jurisdictional barrier. After all, amending the master plan impacts all aspects of city governance and city life: traffic, tax base, schools, residential and commercial development, changes in population density, and environmental concerns.

Of course, the court's reservations—and my own—about wading into local legislative matters would be completely misplaced if vested rights were at stake in this dispute. But they are not. No one argues that they are. "To be vested, a right must have become [for example] a title, legal or equitable, to the present or future enjoyment of property, or to the present or future . . . enforcement of a demand, or a legal exemption from a demand made by another. . . . A right is not vested unless it amounts to something more than a mere expectation of future benefit or interest founded upon an

anticipated continuance of the existing general laws." (Citation omitted; internal quotation marks omitted.) *Hayes Family Ltd. Partnership* v. *Planning & Zoning Commission*, 98 Conn. App. 213, 233, 907 A.2d 1235 (2006), cert. denied, 281 Conn. 903, 916 A.2d 44 (2007); see also *Aspetuck Valley Country Club, Inc.* v. *Weston*, 292 Conn. 817, 834, 975 A.2d 1241 (2009). For example, we have rejected a claim that a validating act was unconstitutional because the plaintiffs had no vested right to sue on the basis of procedural defects in the state environmental protection commissioner's preparation of an environmental impact statement. See *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 71–72, 441 A.2d 68 (1981), overruled in part on other grounds by *Waterbury* v. *Washington*, 260 Conn. 506, 800 A.2d 1102 (2002). We explained that the plaintiffs did not "allege that the commissioner lacked authority, but rather that he attempted to exercise his authority in an unauthorized fashion. 'The law is well established in this state that invalidity which comes about in this manner may be cured retrospectively by appropriate legislation.' " *Manchester Environmental Coalition* v. *Stockton*, supra, 71–72.

In the zoning context, "[a] landowner does not have a vested right in the existing classification of his land. On the contrary, the enabling acts which authorize the enactment of zoning ordinances provide for the amendment of such ordinances. A landowner's right to establish a particular use can be summarily terminated by an amendment which reclassifies his land and outlaws the use in question. . . . A landowner does not obtain a vested right in what has subsequently become a nonconforming use by filing a plan or by applying for a construction permit. . . . Even the issuance of a building permit does not necessarily create a vested right unless the building is substantially under construction before zoning regulations are amended." (Citations omitted; internal quotation marks omitted.) *Marmah, Inc.* v. *Greenwich*, 176 Conn. 116, 120–21, 405 A.2d 63 (1978). The Appellate Court has held that, although a plaintiff may have vested rights in a property, generally, a plaintiff does not have "vested rights in the configuration of that property as it sought to reconfigure it, nor could it have acquired such vested rights without seeking approval of its proposed reconfiguration in accordance with established protocol and procedures." *Stones Trail, LLC* v. *Weston*, 174 Conn. App. 715, 742, 166 A.3d 832, cert. dismissed, 327 Conn. 926, 171 A.3d 59 (2017), and cert. denied, 327 Conn. 926, 171 A.3d 60 (2017).

Further, "[n]o one has a vested right in any given mode of procedure . . . and so long as a substantial and efficient remedy remains or is provided due process of law is not denied by a legislative change." (Citations omitted.) *Crane* v. *Hahlo*, 258 U.S. 142, 147, 42 S. Ct. 214, 66 L. Ed. 514 (1922); see also *Vernon* v. *Cassadaga Valley Central School District*, 49 F.3d 886, 890 (2d Cir.

1995). The failure of the petition to contain sufficient signatures does not therefore vest in the plaintiffs any rights in the successful passage of their amendment. It cannot be said that the plaintiffs have no remedy available to them if they cannot void the Board of Representatives' vote due to an insufficient number of signatures. There are at least two potential avenues, one of which the plaintiffs pursued: (1) challenging the Board of Representatives' vote on the merits as not applying the appropriate legislative standard provided by the charter, or (2) engaging in the legislative process, such as reapplying for an amendment, gathering additional political support, or asking the Board of Representatives to reconsider. I am unaware of anything that prevented the plaintiffs from pursuing this latter remedy in the years since this litigation began or anything preventing them from pursuing it now. I submit that that is a far superior remedy than a court undoing the action of the city's representative body.

I recognize that the majority is *not* taking the action it is today based on a theory of vested rights. It is doing so based on far less justification. To the majority, because the five person Planning Board adopted the plaintiffs' amendment and, based on our count and no one else's, the petition contained an insufficient number of signatures, the Board of Representatives had no business taking action on that amendment. And the majority is here to correct that. I simply disagree that that is— or should be—a court's role, and I believe our precedents agree.

My disagreement is further supported by the fact that the United States Court of Appeals for the Second Circuit has rejected a remarkably similar challenge to a town planning board's enactment of zoning ordinances. In *Orange Lake Associates, Inc.* v. *Kirkpatrick*, 21 F.3d 1214, 1224 (2d Cir. 1994), the Second Circuit held that a developer's due process rights were not violated when the town board of Newburgh, New York, enacted zoning ordinances to implement a new master plan for Newburgh. The Second Circuit agreed that the developer had "no vested right to approval of its plans for the project" and that there was nothing to indicate that the developer's claimed procedural defects affected the decisions of the town board or Newburgh's planning board. Id. Likewise, here, the plaintiffs have no vested right in the approval of their proposed amendment, as nothing currently before this court suggests that the insufficient signatures affected the Board of Representatives' decisions on the merits of the amendment, given that the trial court bifurcated the trial to address the jurisdictional issue first. If the law were otherwise, the judiciary would be invited regularly to intervene in routine legislative proceedings, in contravention of our settled role. Vested rights provide a clear delineation so that courts do not get involved in the kind of policymaking that is better left to more represen-

tative bodies elected to conduct the work of local law-making.

Because I would conclude that any erroneous referral of the petition by the Planning Board does not vitiate the action of the Board of Representatives, I would reverse the trial court's judgment and remand the case to that court for additional proceedings on whether the Board of Representatives acted arbitrarily, illegally, or in a manner that was inconsistent with the guiding zoning standards when voting on the merits of the proposed amendment. I therefore respectfully dissent.

[1] Section C6-30-3 of the charter guides the Planning Board when it acts on the master plan. Section C6-30-3 provides: "The Master Plan shall be the general land use Plan for the physical development of the City. The Plan shall show the division of Stamford into land use categories such as, but not restricted to, the following:

"1. Residential—single family plots one acre or more.

"2. Residential—single family plots less than one acre.

"3. Residential—multi-family—low density.

"4. Residential—multi-family—medium density.

"5. Commercial—local or neighborhood business.

"6. Commercial—general business.

"7. Industrial.

"The land use categories indicated on the Master Plan shall be defined by the Planning Board and made a part of such Plan. The Plan shall also show the Board's recommendation for the following: streets, sewers, bridges, parkways, and other public ways; airports, parks, playgrounds and other public grounds; the general location, relocation and improvement of schools and other public buildings; the general location and extent of public utilities and terminals, whether publicly or privately-owned, for water, light, power, transit, and other purposes; the extent and location of public housing and neighborhood development projects. Such other recommendations may be made by the said Board and included in the Plan as will, in its judgment, be beneficial to the City. Such Plan shall be based on studies of physical, social, economic, and governmental conditions and trends and shall be designed to promote with the greatest efficiency and economy, the coordinated development of the City and the general welfare, health and safety of its people."

Section C6-30-7 of the charter provides in relevant part that, when acting on a proposal to approve or reject an amendment to the master plan, "the Board of Representatives shall be guided by the same standards as are prescribed for the Planning Board in Section C6-30-3 of this Charter. . . ."

[2] For example, the charter contains much clearer language in another provision denying the Board of Representatives authority over highways without Planning Board approval. See Stamford Charter § 214-40 ("[T]he Board of Representatives is empowered, whenever in its opinion public health, safety, welfare, convenience or necessity require[s], to lay out, alter, extend, enlarge, exchange or discontinue any highway or the grade of any highway," but "[s]aid powers granted to the Board of Representatives shall not be exercised without the approval of the Planning Board, the Board of Finance and the Mayor").

[3] Usually, a court assesses whether a legislative act is "substantive," as opposed to "procedural," when determining whether the act applies prospectively or retroactively. See, e.g., *D'Eramo* v. *Smith*, 273 Conn. 610, 620–21, 872 A.2d 408 (2005) ("Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . While there is no precise definition of either [substantive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." (Citations omitted; footnote omitted; internal quotation marks omitted.)). Whether a provision constitutes a " 'condition precedent' " implicates the same "mandatory" or "directory" analysis this dissenting opinion undertakes in the text. *Leo Fedus & Sons Construction Co.* v. *Zoning Board of Appeals*, supra, 225 Conn. 440, quoting *Donohue* v. *Zoning Board of Appeals*, supra, 155 Conn. 554; see also *Leo Fedus & Sons Construction Co.* v. *Zoning Board of Appeals*, supra, 440 ("in support of our conclusion . . . the 'statute contains nothing which expressly invalidates a belated

decision or which inferentially makes compliance therewith a condition precedent' ").

[4] Although *Stamford Ridgeway Associates* refers to a landowner's "right to appeal" to the Board of Representatives, the charter provision at issue before us, § C6-30-7, does not use this language, and the language it does use is not similar to that used when an aggrieved party has a "right to appeal" to a higher tribunal. The charter instead provides that a protest petition leads to a "referr[al] by the Planning Board to the Board of Representatives," with the Planning Board's decision having no force and effect. Stamford Charter § C6-30-7. Where the charter's drafters sought to provide a "right to appeal" in the sense we in the judiciary understand it, they did so. See Stamford Charter § C6-30-20.

[5] The flaw in the majority's syllogism is demonstrated by the illogical suggestion that those landowners within the area described by the charter are "most affected," or are the only ones "directly affected," by the passage or defeat of an amendment to the master plan or the zoning regulation. Many such proposals are just as likely to affect directly the interests of innumerable Stamford residents on issues of economics, environment, and population density, to name a few. But *Stamford Ridgeway Associates* concludes that the ability to *petition* the Board of Representatives is not thwarted by the inclusion of additional area, not affected by a proposed amendment, in an application. See *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 214 Conn. 426. So, although the charter "very clearly does not provide all Stamford residents with a right to *protest*"; (emphasis added); as the majority states, the charter is similarly very clear that, once an amendment has been referred, erroneously or not, the Board of Representatives' authority to approve or reject an *amendment* is not limited to consideration of only the interests of the residents who protested.

[6] The majority's reliance on *Stamford Ridgeway Associates* continues with its suggestion that we have previously held that "sufficient signatures are needed for [the] Board of Representatives to reconsider" an amendment. It was not this court that said that, however. Rather, that came from an opinion by Attorney Robert A. Fuller, whom the president of the Board of Representatives hired to review the matter. See *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 214 Conn. 412–13. And, although the majority may contend that this court relied on Fuller's opinion to hold that the Board of Representatives could vote on separate zone changes contained in one application, nowhere in *Stamford Ridgeway Associates* did this court conclude that the Board of Representatives' authority to vote on amendments is circumscribed by insufficient signatures. Indeed, the words, "if there are sufficient signatures," do not follow the *Stamford Ridgeway Associates* quotation, as the majority suggests in footnote 11 of its opinion. If such a phrase did appear, that would provide the majority some traction for its assertion that a valid petition is a "condition precedent" to the exercise of the Board of Representatives' authority. Instead, the words "sufficient" or "enough" appear only in quotations of Fuller's written advice or the trial court's memorandum of decision in *Stamford Ridgeway Associates*, not in this court's analysis or conclusion. See *Stamford Ridgeway Associates* v. *Board of Representatives*, supra, 414, 417 n.5, 420, 426, 429.

[7] The majority's citation to *Woldan* v. *Stamford*, 22 Conn. Supp. 164, 167, 164 A.2d 306 (1960), to support the proposition that a "matter was not properly before the [B]oard of [R]epresentatives" because the petition in that case did not contain enough signatures as required by the charter is unpersuasive, as this court has never so held. As I demonstrated, the purported invalidity of the petition has no bearing on the subsequent exercise of legislative authority by the Board of Representatives.

[8] Also, the majority cites *Burke* to indicate that a referral occurs only " '[i]n th[e] event' " that a petition meets the signature provision. First, *Burke* only restates the charter provisions at issue, and does so incorrectly and without further analysis, as the relevant charter provision does not contain the phrase, "in the event." See generally Stamford Charter § C6-30-7. Second, *Burke* pertained to whether the Board of Representatives had failed to give notice and to provide a hearing, and could relegate review of the amendment at issue to a committee; the suggestion that *Burke* stands for the proposition that a referral occurs only " '[i]n th[e] event' " that the petition contains sufficient signatures is dictum at best. See *Burke* v. *Board of Representatives*, supra, 148 Conn. 35.

[9] The same would be true if the Planning Board had *rejected* the plaintiffs' application, the plaintiffs petitioned for referral to the Board of Representatives pursuant to § C6-30-8, the Planning Board erroneously referred the

petition before validating the signatures, and the Board of Representatives approved the plaintiffs' proposed amendment. In my view, the Board of Representatives' action could not be undone by a court because of a supposed erroneous referral.

---